CROSNER LEGAL, P.C.
Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Kurt D. Kessler (SBN 327334)
kurt@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LATINA MCVAY, individually and on behalf of all others similarly situated, | Case No.  2:25-cv-6176 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| v. | |
| THE KROGER CO., | |
| Defendant. | |

Plaintiff LaTina McVay ("Plaintiff") on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby brings this action against The Kroger Co. ("Defendant"), and upon information and belief and investigation of counsel, alleges as follows:

**JURISDICTION AND VENUE**

1.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed class; (2) members of the proposed classes have a different citizenship from Defendant, an Ohio corporation; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate, exclusive of interest and costs. *See e.g., Montera v. Premier Nutrition Corp*., No. 16-CV-06980-RS, 2022 WL 10719057, at *3 (N.D. Cal. Oct. 18, 2022), *aff'd*, 111 F.4th 1018 (9th Cir. 2024) (noting lodestar after jury trial in a false and misleading labeling consumer protection action exceeded $6 million)

2.      This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant, on its own and through its agents, is responsible for the distribution, marketing, labeling, and sale of the Products in California, specifically in this judicial district. The marketing of the Products, including the decision of what to include and not include on the labels, emanates from Defendant. Thus, Defendant has intentionally availed itself of the markets within California through its advertising, marketing, and sale of the Products to consumers in California, including Plaintiff.

3.      The Court also has specific jurisdiction over Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it is reasonable for Defendant to defend this lawsuit because it has sold deceptively advertised Products to Plaintiff and members of

the Class in California. By distributing and selling the Products in California, Defendant has intentionally and expressly aimed conduct at California which caused harm to Plaintiff and the Class that Defendant knows is likely to be suffered by Californians.

4.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiff purchased the Products within this District.

### INTRODUCTION

5.    This is a California consumer class action for violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), breach of express warranty, and unjust enrichment.

6.    Defendant manufactures, distributes, advertises, and sells Abound® brand dog food products. The packaging prominently displays on the front of the label that the Products[1] contain "**NO Artificial Colors, Flavors or Preservatives.**"

7.    This statement is false. Each of the Products are made with manufactured citric acid—an artificial preservative ingredient used in animal food products.

8.    Defendant's packaging, labeling, and advertising scheme is intended to give consumers the impression that they are buying a premium product for their pets that contains "No Artificial Colors, Flavors or Preservatives."

---

[1] "Products" means all Abound® dog food products labeled as having "No Artificial Colors, Flavors or Preservatives" that contain citric acid, including but not limited to (1) Abound® Wild Beginnings All Life Stages Dry Dog Food Beef Venison & Lamb, (2) Abound® Wild Beginnings All Life Stages Dry Dog Food Chicken, Turkey & Duck, and (3) Abound® Wild Beginnings All Life Stages Dry Dog Food Salmon, Trout & Whitefish.

2

9.      Plaintiff, who purchased the Products for her dogs in California, was deceived by Defendant's unlawful conduct and brings this action on her own behalf and on behalf of other consumers to remedy Defendant's unlawful acts.

<u>PARTIES</u>

10.      Defendant The Kroger Co. is an Ohio corporation that maintains its principal place of business in Cincinnati, Ohio. At all times during the class period, Defendant was the manufacturer, distributor, marketer, and seller of the Products. Defendant represents that "Abound® is premium pet food made from an abundance of the highest-quality nutrient-dense ingredients, without unwanted fillers. Abound goes above and beyond – never compromising on ingredients or taste – to deliver optimal nutrition for pets."[2]

11.      Plaintiff is a resident of California. Plaintiff purchased the Products for her dog in California during the class period. Plaintiff was tricked by Defendant's deceptive advertising and labeling claims when buying the Products as set forth below.

12.      Plaintiff has purchased Abound® Wild Beginnings All Life Stages Dry Dog Food Beef Venison & Lamb, Abound® Wild Beginnings All Life Stages Dry Dog Food Chicken, Turkey & Duck, and Abound® Wild Beginnings All Life Stages Dry Dog Food Salmon, Trout & Whitefish from Ralphs retail grocery stores near her home in North Hollywood throughout the class period. Her last purchase of the dog food Products was in early 2025.

13.      Plaintiff saw and relied on the "No Artificial Colors, Flavors or Preservatives" claim on the labels of the Products when she purchased the Products. Plaintiff would not have purchased the Products, or would have paid less for the Products, had she known they contain the artificial preservative citric acid. She paid approximately $24.00 for each Product she purchased.

---

[2] Abound®, available at https://www.kroger.com/b/abound

CLASS ACTION COMPLAINT

14.    As a result, Plaintiff suffered injury in fact when she spent money to purchase the Products she would not have purchased, or would have paid less for, absent Defendant's misconduct.

15.    Plaintiff believes it is not right for Defendant to place a false statement on the front of its Products about the contents of the dog food and seeks to have Defendant stop the false advertising.

16.    Plaintiff desires to purchase the Products again if the labels of the Products were accurate and if the Products actually contained "No Artificial Colors, Flavors or Preservatives." However, as a result of Defendant's ongoing misrepresentations, Plaintiff is unable to rely on the Products' advertising and labeling when deciding in the future whether to purchase the Products.

17.    Plaintiff is not a food scientist and will not know if the Products are re-formulated to truthfully contain no artificial preservatives making Plaintiff at imminent risk of being harmed.

**FACTUAL ALLEGATIONS**

**"NO ARTIFICIAL COLORS, FLAVORS OR PRESERVATIVES" IS PROMINENTLY DISPLAYED ON THE FRONT LABELS OF THE PRODUCTS**

18.    The front labels for each of the Products prominently state that the Products contain "**NO Artificial Colors, Flavors or Preservatives**" thereby misleading reasonable consumers into believing that the Products are free from artificial preservative ingredients. However, each of the Products contains an artificial preservative called manufactured citric acid.

19.    Each label contains the same "**NO Artificial Colors, Flavors or Preservatives**" statement:



1    20.    Below are the front labels for each Product:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

21.    The ingredients list for the Beef, Venison & Lamb version of the Products is below stating that "CITRIC ACID (PRESERVATIVE)" is an ingredient. Each Product contains the same "CITRIC ACID (PRESERVATIVE)" ingredient:

# INGREDIENTS

BEEF, BEEF MEAL, CHICKEN MEAL, DRIED CHICKPEAS, GROUND SORGHUM, BARLEY, OATMEAL, BEEF FAT (PRESERVED WITH MIXED TOCOPHEROLS), VENISON, FLAXSEEDS, POTATO PROTEIN, DRIED EGG PRODUCT, LAMB, NATURAL FLAVOR, LAMB MEAL, GROUND MISCANTHUS GRASS, FISH OIL, SALT, DRIED CHICORY ROOT, POTASSIUM CHLORIDE, TAURINE, DRIED BLUEBERRIES, DRIED CARROTS, DRIED CRANBERRIES, DRIED KELP, CHOLINE CHLORIDE, CITRIC ACID (PRESERVATIVE), MIXED TOCOPHEROLS (PRESERVATIVE), IRON AMINO ACID COMPLEX, ZINC AMINO ACID COMPLEX, VITAMIN E SUPPLEMENT, FERROUS SULFATE, ZINC OXIDE, L-CARNITINE, DRIED BACILLUS COAGULANS FERMENTATION PRODUCT, COPPER AMINO ACID COMPLEX, COPPER SULFATE, SODIUM SELENITE, MANGANESE AMINO ACID COMPLEX, VITAMIN A SUPPLEMENT, NIACIN SUPPLEMENT, D-CALCIUM PANTOTHENATE, RIBOFLAVIN SUPPLEMENT, MANGANOUS OXIDE, THIAMINE MONONITRATE, VITAMIN D3 SUPPLEMENT, VITAMIN B12 SUPPLEMENT, PYRIDOXINE HYDROCHLORIDE, BIOTIN, CALCIUM IODATE, FOLIC ACID, ROSEMARY EXTRACT.

22.    Defendant also includes other advertisements on its website that further support and repeat the ""**NO Artificial Colors, Flavors or Preservatives**" front label promise:



### THE MANUFACTURED CITRIC ACID IN THE PRODUCTS IS ARTIFICIAL

23.    Defendant uses artificial manufactured citric acid in the Products.[3] Commercial food manufactures, including Defendant, use a synthetic form of citric acid that is derived from heavy chemical processing.[4] Commercially produced citric acid is manufactured using a type of black mold called *Aspergillus niger* which is modified to increase citric acid production.[5]

24.    For over a century, scientists have been actively creating mutant strains of *Aspergillus niger* to improve their usefulness for producing enzymes, citric acid, and other valuable compounds.[6] This process of intentionally inducing mutations is called mutagenesis.[7]

25.    "Throughout the last century, biotechnologists have developed *A. niger* into a multipurpose cell factory with a product portfolio worth billions of dollars each year."[8]

---

[3] Iliana E. Sweis, et al., *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports*, TOXICOL REP. 5:808-812 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/ and attached as **Exhibit A**.

[4] A. Hesham, Y. Mostafa & L. Al-Sharqi, *Optimization of Citric Acid Production by Immobilized Cells of Novel Yeast Isolates*, 48 MYCOBIOLOGY 122, 123 (2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7178817/

[5] *Id*; Pau Loke Show, et al., *Overview of citric acid production from Aspergillus niger*, FRONTIERS IN LIFE SCIENCE, 8:3, 271-283 (2015), available at https://www.tandfonline.com/doi/full/10.1080/21553769.2015.1033653

[6] *See* Tong, Z., Zheng, X., Tong, Y. et al. *Systems metabolic engineering for citric acid production by Aspergillus niger in the post-genomic era*. MICROB CELL FACT 18, 28 (2019).*available at* https://doi.org/10.1186/s12934-019-1064-6

[7] *See id.*

[8] Timothy C. Cairns, Lars Barthel, Vera Meyer; *Something old, something new: challenges and developments in Aspergillus niger biotechnology*. ESSAYS BIOCHEM 26 July 2021; 65 (2): 213–224. doi: https://doi.org/10.1042/EBC20200139

26.    "The biochemical foundations of the biosynthesis process of citric acid were elucidated in the 1950s with the discovery of glycolysis and the tricarboxylic acid cycle":[9]



Figure 2. Major milestones in the discovery and research of citric acid [28,31].

| | |
|---|---|
| Period 7th century | • The discovery of citric acid by Islamic alchemist Abu Musa Jabir Ibn Hayyan |
| Year 1784 | • Carl Wilhelm Scheele, a Swedish chemist, isolated citric acid from lemon juice |
| Year 1834 | • Jstus Liebig, a German chemist, recognized that citric acid is hydroxytricarboxylic acid |
| Year 1880 | • The first chemical synthesis of citric acid was performer by Girmaux and Adam |
| Year 1891 | • Dunschmann and Pechmann synthesize citric acid from ethanedi carboxylic acid |
| Year 1897 | • Lawrence used the condensation of sthyl oxaloacetate with ethyl bromoacetate in several successive reactions to finally obtain citric acid |
| Year 1893 | • Carl Wehmer discovered that citric acid could be produced from sugar by the Penicillium mold |
| Year 1919 | • First succesful fermentation proces using Penicillium at Les Produits Organiques de Tirlemont in Tienen, Belgium |
| Year 1917 | • James Currie and Charles Thom discovered that citric acid could be produced in large quantities by Aspergillus niger |
| Year 1923 | • The Currie – Thoma fermentation proces was comercialized by Pfizer Inc. |
| Year 1937 | • Nobel Prize for Hans Krebs and Fritz Lipmann for presenting the mechanisms of TCA |
| Period 1937 – 1956 | • Studies on the influence of micro/macroelements in culture media and growth parameters on optimized citric acid fermentation |
| Period 1997 – 1996 | • Advances in molecular biology and genetics of Aspergillus niger are reflected in the intense focus on genes, cloning and sequence analyses |
| Period 1997 – 2017 | • Generation of non–homologous mutants |

---

[9] Książek, E. Citric Acid: Properties, *Microbial Production, and Applications in Industries*. MOLECULES 2024, 29, 22. https://doi.org/10.3390/molecules29010022

27. "Until 1980, *Aspergillus niger* strains used in industrial production were obtained through screening and mutagenesis. Mutagenesis techniques are still in use and continue to yield positive results in improving biosynthesis efficiency. The most commonly used mutagens are physical factors (gamma and UV radiation), chemical factors, and hybrid methods that combine physical and chemical characteristics. The development of genetic engineering has allowed the application of DNA recombination technologies to improve strains, with *Aspergillus niger* being used as a host for the expression of heterologous proteins."[10]

28. Thus, Defendant uses citric acid that is processed from man-made mutant strains of *Aspergillus niger*. This is an "artificial" industrial manufacturing process.

29. One of Defendant's competitors notes: citric acid is "[u]sed as a preservative, citric acid can cause digestive upset in dogs, including symptoms like vomiting and diarrhea. It's particularly harmful to dogs with sensitive stomachs or those prone to bladder stones."[11]

30. Consumption of manufactured citric acid has been associated with adverse health events like joint pain with swelling and stiffness, muscular and stomach pain, as well as shortness of breath.[12] Defendant does not use natural citric acid extracted from fruit in the Products. This is because "[a]proximately 99% of the world's production of [citric acid] is carried out using the fungus

---

[10] Książek, E. Citric Acid: Properties, *Microbial Production, and Applications in Industries*. MOLECULES 2024, 29, 22. https://doi.org/10.3390/molecules29010022

[11]    https://puppercrust.com/blog/dog-nutrition/10-common-but-unhealthy-dog-treat-ingredients-to-avoid

[12] Sweis, *et al.*, **Exhibit A**.

*Aspergillus niger* since 1919."[13] As explained by a study published in the *Toxicology Reports Journal*:

> Citric acid naturally exists in fruits and vegetables. However, **it is _not_ the naturally occurring citric acid, but the manufactured citric acid (MCA) that is used extensively as a food and beverage additive**. Approximately 99% of the world's production of MCA is carried out using the fungus *Aspergillus niger* since 1919. *Aspergilus niger* is a known allergen.[14]

31.    Manufactured citric acid contains residues of synthetic chemicals. The *Toxicology Reports Journal* article explains that "the potential presence of impurities or fragments from the *Aspergillus niger* in [manufactured citric acid] is a significant difference that may trigger deleterious effects when ingested."[15] The article further explains:

> Given the thermotolerance of A. niger, there is great potential that byproducts of A. niger remain in the final [manufactured citric acid] product. Furthermore, given the pro-inflammatory nature of A. niger even when heat-killed, repetitive ingestion of [manufactured citric acid] may trigger sensitivity or allergic reactions in susceptible individuals. Over the last two decades, there has been a significant rise in the incidence of food allergies.[16]

32.    The Food and Drug Administration ("FDA") explains that the "Solvent extraction process for citric acid" is accomplished via "recovery of citric acid from conventional *Aspergillus niger* fermentation liquor may be safely used to produce food-grade citric acid in accordance with the following conditions: (a) The solvent used in the process consists of a mixture of n- octyl alcohol meeting the requirements of § 172.864 of this chapter, **synthetic** isoparaffinic petroleum

---

[13] *Id.*

[14] *Id.*

[15] Sweis, *et al.*, **Exhibit A**.

[16] *Id.*

hydrocarbons meeting the requirements of § 172.882 of this chapter, and tridodecyl amine. 12 C.F.R. § 173.280 (emphasis added). Chemical solvents such as n-octyl alcohol and synthetic isoparaffinic petroleum hydrocarbons are used to extract the citric acid that Defendant uses in the Products from *aspergillus niger* fermentation liquor. See 21 C.F.R § 173.280. The citric acid that Defendant uses in the Products is produced through chemical solvent extraction and contains residues of those chemical solvents.

33. The FDA has determined that manufactured citric acid is not natural; it is artificial. The FDA has sent warning letters to companies stating that certain products labeled as "natural" are misbranded because they contain citric acid as an ingredient. For example, on August 29, 2001, the FDA sent Hirzel Canning Company ("Hirzel") a warning letter regarding its canned tomato products.[17] With respect to Hirzel's Chopped Tomatoes Onions & Garlic and Chopped Mexican Tomatoes & Jalapenos, the FDA stated that these products could not bear the "All Natural" claim on the label because the products contained a synthetic ingredient, citric acid.[18]

34. Similarly, on August 16, 2001, the FDA sent Oak Tree Dairy Farm, Inc. ("Oak Tree") a warning letter regarding its "Oaktree Real Brewed Iced Tea," "Oaktree Fruit Punch," and "Oaktree All Natural Lemonade" products.[19] With respect to Oak Tree's "Oaktree Real Brewed Iced Tea," the FDA stated that this product could not bear the "100% Natural" and "All Natural" claims on the label because the product contained a synthetic ingredient, citric acid.[20]

---

[17] *See* **Exhibit B** attached hereto.

[18] *Id.*

[19] *See* **Exhibit C** attached hereto.

[20] *Id.*

35.   In a warning letter sent to Chiquita Brands International, Inc. and Fresh Express, Inc., the FDA warned that certain products were misbranded under the Federal Food Drug and Cosmetics Act because they "contain the *chemical preservatives ascorbic acid and citric acid* but their labels fail to declare these *preservatives* with a description of their functions. 21 C.F.R. [§] 101.22" (emphasis added).[21]

36.   The Environmental Protection Agency ("EPA") provides the following simple schematic of the manufacturing process for citric acid which includes the use of synthetic solvents like sulfuric acid:[22]



37.   A prominent functional medicine practitioner, notes that the "[p]resent day process of creating manufactured citric acid involves feeding sugars derived from GMO corn to black mold, which then ferments to form manufactured citric acid."[23] The article notes that "*Aspergillus niger* is associated with systemic inflammatory issues, including respiratory, gastrointestinal,

---

[21] *See* **Exhibit D** attached hereto at page 2, highlighted.

[22] U.S. Environmental Protection Agency, *Citric Acid Supple Chain*, *available at* https://www.epa.gov/system/files/documents/2023-03/Citric+Acid+Supply+Chain+Profile.pdf

[23] Dr. Ryan Monahan, *Citric Acid: A Common Food Additive With An Uncommon Source* (2024) *available at* https://www.peacefulmountainmedicine.com/post/citric-acid-a-common-food-additive-with-an-uncommon-source

neurological and musculoskeletal. Due to the potential for fragments of *Aspergillus niger* to make their way into the finished product of manufactured citric acid, this toxic inflammatory substance is likely being ingested by consumers of products containing citric acid. Even with high-heat processing to kill it, research has shown *Aspergillus niger* can still elicit an inflammatory response."[24]

38.    A article titled *Avoid citric acid: a mold byproduct!* notes that "[f]ood manufacturers leave out that citric acid is derived from genetically modified black mold grown on GMO corn syrup" and that "[c]ompanies continuously capitalize on an ignorance-based market."[25] "Citric acid production has become a refined and highly prized industrial process." The *Aspergillus niger* used to produce citric acid is engineered to increase production of citric acid which has "resulted in countless generations of genetically modified mutant variants, now specialized for industrial-scale economics."[26]

39.    "Further genetic modification in the lab has taken place through the engineering of the glycolytic pathway, resulting in a metabolic-streamlining that facilitates greater citric acid production from sugar while shutting off side avenues of glycolysis."[27]

40.    "Mutagenesis has been used in recent years to improve the citric-acid producing strains so that they can be used in industrial applications. The most common methods include the use of mutagens to induce mutations on the parental strains. The mutagens utilized for improvements are gamma radiation, ultraviolet

---

[24] *Id.*

[25] Serge Gregoire, Avoid citric acid: a mold byproduct! (July 13, 2021) *available at* https://www.linkedin.com/pulse/avoid-citric-acid-mold-byproduct-serge-gregoire/

[26] *Id.*

[27] *Id.*

radiation and often chemical mutagens. For hyperproducer strains, a hybrid method that combines ultraviolet and chemical mutagens is used (Ratledge & Kristiansen Citation2001)."[28]

41.    Below is a schematic representation of the metabolic reactions involved in citric acid production, the enzymes, the known feedback loops and their locations within the cellular structure of *Aspergillus niger*:[29]



[28] Show, P. L., Oladele, K. O., Siew, Q. Y., Aziz Zakry, F. A., Lan, J. C. W., & Ling, T. C. (2015). Overview of citric acid production from Aspergillus niger. FRONTIERS IN LIFE SCIENCE, 8(3), 271–283, *available at* https://doi.org/10.1080/21553769.2015.1033653

[29] *Id.*

1
2
3
4
5

42.     Dictionary definitions define "artificial" as something made by man. For example, "artificial" is defined as "made by human skill; produced by humans …"[30] Merriam-Webster's online dictionary states that "artificial" means "humanly contrived …"[31] Cambridge Dictionary states that "artificial" means "made by people, often as a copy of something natural."[32]

6
7
8

43.     Below are images of the chemical process used to create manufactured citric acid for use in food and beverage products – a process that is visibly artificial:

9
10
11
12
13
14
15

 

16

**THE CITRIC ACID IN THE PRODUCTS FUNCTIONS AS A PRESERVATIVE**

17
18

44.     The ingredient panel for the Products notes that citric acid in the Products functions as a preservative by stating: "Citric Acid (Preservative)."

19
20
21
22

45.     The FDA defines a preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for

23
24

[30] *Artificial*, DICTIONARY.COM, *available at* https://www.dictionary.com/browse/artificial

25
26

[31] *Artificial*, MERRIAM-WEBSTER'S DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/artificial

27
28

[32] *Artificial*, CAMBRIDGE DICTIONARY, *available at* https://dictionary.cambridge.org/us/dictionary/english/artificial

their insecticidal or herbicidal properties." 21 C.F.R. §101.22(a)(5). The FDA has listed citric acid as a preservative in its "Overview of Food Ingredients, Additives and Colors" as shown below:[33]

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| Preservatives | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, citric acid, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

46.    The Encyclopedia Britannica also classifies citric acid as a preservative because it has antioxidant properties such as "enzyme inhibitor/metal chelator."[34]

47.    The Agricultural Marketing Service of the United States Department of Agriculture ("USDA") has also recognized the use of citric acid as a preservative stating that "Citric acid has a wide variety of uses, some of which can provide preservative functions, primarily though lowering the pH of the food."[35]

48.    The USDA's Food Safety Inspection Service's "Guideline for Label Approval" states that "[s]ome common chemical preservatives include BHA, BHT, calcium propionate, citric acid, natamycin and sodium propionate."[36]

---

[33] *Overview of Food Ingredients, Additives & Colors,* FOOD AND DRUG ADMINISTRATION, *available at* https://web.archive.org/web/20220901032454/http://www.fda.gov/food/food-ingredients-packaging/overview-food-ingredients-additives-colors

[34] *Preservatives*, BRITANICA, *available at* https://www.britannica.com/topic/food-additive/Preservatives#ref502211

[35] *Citric Acid and Salts*, UNITED STATES DEPARTMENT OF AGRICULTURE, *available at* https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

[36] FSIS Guideline for Label Approval, UNITED STATES DEPARTMENT OF AGRICULTURE, *available at*

CLASS ACTION COMPLAINT

49.   Several academic journals also note the use of citric acid as a preservative.[37] Indeed, "Citric acid acts as a preservative in many processed foods, keeping them fresh. It does this by slowing or helping prevent the formation of bacteria, mold, yeast, and fungus."[38] "Today, citric acid is one of the most common and widely-used preservatives in the world[.]"[39]

50.   A published research article title *Citrate in dog food* states: "Citric acid is characterized as preservative, within the category of technological additives, and produced by specific *Aspergillus niger* strains."[40]

51.   European regulations state that citric acid used in animal feeds is in the "additive" category with "Function group: preservatives."[41]  The regulations note that citric acid in animal feed is produced by *Aspergillus niger*.[42]

---

https://www.fsis.usda.gov/sites/default/files/media_file/documents/FSIS-GD-2023-0001.pdf

[37] K. Kirimura, et al., *Citric Acid*, COMPREHENSIVE BIOTECHNOLOGY (SECOND EDITION) (2011), *available at* https://www.sciencedirect.com/science/article/abs/pii/B9780080885049001690?via%3Dihub; K.M.S. Islam, *Use of citric acid in broiler diets*, WORLD'S POULTRY SCIENCE JOURNAL VOL. 68, ISSUE 1 (Feb. 21, 2012), *available at* https://www.cambridge.org/core/journals/world-s-poultry-science-journal/article/abs/use-of-citric-acid-in-broiler-diets/DA15C2C1F90667525BF2414DF3BFF646 ("Citric Acid (CA) is a weak organic acid which is a natural preservative and can add an acidic or sour taste to foods and soft drinks.").

[38] *What is citric acid, and what is it used for?*, MEDICAL NEWS TODAY (July 23, 2021), *available at* https://www.medicalnewstoday.com/articles/citric-acid

[39] *Citric Acid: One of the Most Important Preservatives in The World*, FBC INDUSTRIES, INC. (Feb. 5, 2019), *available at* https://fbcindustries.com/citric-acid-one-of-the-most-important-preservatives-in-the-world/

[40] Beynen, AC. *Dog Food in Citrate*. (2023) *available at* https://www.researchgate.net/publication/376857678_Beynen_AC_2023_Citrate_in_dog_food

[41] Commission Implementing Regulation (EU) 2022/415 of 11 March 2022 concerning the authorisation of malic acid, citric acid produced by Aspergillus niger DSM 25794 or CGMCC 4513/CGMCC 5751 or CICC 40347/CGMCC 5343. Official J EU 2022; L85/6 *available at* https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32022R0415

[42] *Id.*

---

CLASS ACTION COMPLAINT

52.     Citric acid functions as a preservative in the Products regardless of whether Defendant intended to use citric acid as a preservative. Citric acid functions as a preservative even if it is also added to the Products for some other use. *See* 21 C.F.R. §101.22(a)(5) (defining preservatives as "any chemical that, when added to food, *tends to* prevent or retard deterioration") (emphasis added); *see also* Merriam-Webster's Dictionary (defining "preservative" as "something that preserves or *has the power of preserving*.") (emphasis added).[43]

**REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S FALSE LABELING STATEMENT AND SUFFERED ECONOMIC INJURY**

53.     Consumers, like Plaintiff, relied on Defendant's "No Artificial Colors, Flavors or Preservatives" labeling statement when purchasing food for their dogs. The "No Artificial Colors, Flavors or Preservatives" statement on the labels of the Products is material to reasonable consumers.

54.     "[F]oods bearing 'free-from' claims are increasingly relevant to Americans, as they perceive the products as closely tied to health … 84 percent of American consumers buy free-from foods because they are seeking out more natural or less processed foods. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a free-from claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent). Among the top claims free-from consumers deem most important are trans-fat-free (78 percent) and preservative-free (71 percent)."[44]

---

[43] *Preservative,* MERRIAM-WEBSTER'S DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/preservative?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

[44] *84% of Americans buy "free-from" foods because they believe them to be more natural or less processed*, Mintel (Sept. 3, 2015), *available at* https://www.mintel.com/press-centre/84-of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed/

55.     The same holds true for pet food products. A survey conducted by Mintel "reported roughly 46% of new pet food products launched in 2023 are touting 'no additives/preservatives.'"[45] Moreover, "45% of pet owners said they prefer buying pet food that is free from artificial ingredients, their logic being that these products are healthier for their pets compared to those containing artificial ingredients."[46]

56.     The premium and specialty pet food market is continuing to grow, with pet owners opting to invest in premium and specialty pet foods that incorporate high quality and innovative ingredients.[47]

57.     The organic pet food market is expected to reach a valuation of $4.5 billion, as pet owners become more health-conscious and continue to seek natural food alternatives to ensure the well-being of their pets, placing an emphasis on fresh, nutrient-dense, and preservative-free pet food options.[48]

58.     Plaintiff and the putative class members suffered economic injury as a result of Defendant's actions. Plaintiff and putative class members spent money that, absent Defendant's actions, they would not have spent. Plaintiff and putative class members are entitled to damages and restitution for the purchase price of the Products that were falsely labeled and advertised. Consumers, including Plaintiff,

---

[45] *Consumers show steadfast preference for all-natural pet food*, PET FOOD PROCESSING, *available at* https://www.petfoodprocessing.net/articles/17347-consumers-show-steadfast-preference-for-all-natural-pet-food#:~:text=Mintel%20reported%20roughly%2046%25%20of,claims%20at%2021%25%20of%20products.

[46] *Id*.

[47] *Pet Foods Ingredient Market*, MARKETS AND MARKETS, available at https://www.marketsandmarkets.com/Market-Reports/global-pet-food-and-care-products-market-147.html?

[48] *Organic Pet Food Market Poised for 7.8% CAGR Growth, Reaching USD 4.50 Billion by 2035*, available at https://www.morningstar.com/news/accesswire/989072msn/organic-pet-food-market-poised-for-78-cagr-growth-reaching-usd-450-billion-by-2035-future-market-insights-inc

CLASS ACTION COMPLAINT

1    would not have purchased Defendant's Products, or would have paid less for the
2    Products, if they had known the Products actually contain an artificial
3    preservative ingredient.

**NO ADEQUATE REMEDY AT LAW**

5    59.    Plaintiff and members of the class are entitled to equitable relief as
6    no adequate remedy at law exists. The statutes of limitations for the causes of
7    action pled herein vary. Class members who purchased the Products more than
8    three years prior to the filing of the complaint will be barred from recovery if
9    equitable relief were not permitted under the UCL.

10    60.    Legal remedies that require more "stringent" proof, and are therefore
11    harder to obtain, are not "equally prompt and certain."

12    61.    Plaintiff is pleading the UCL claim in the alternative and asserts
13    entitlement to equitable relief to recover the amounts paid for the Product to the
14    extent those amounts (in whole or in part) are deemed not recoverable as damages
15    for Plaintiff's legal claims.

16    62.    Plaintiff lacks an adequate remedy at law if the amount of damages
17    is less than the price paid for the goods and restitution and/or injunctive relief may
18    also be more certain, prompt, and efficient than other legal remedies.

19    63.    Damages might be deemed not recoverable for Plaintiff's legal
20    claims—specifically, because the UCL claim covers more conduct and therefore
21    may be less burdensome to prove. This is because the scope of actionable
22    misconduct under the unfair prong of the UCL is broader than the other causes of
23    action asserted herein, and may be less burdensome to prove than the CLRA and
24    breach of express warranty. It includes Defendant's overall unfair marketing
25    scheme to promote and brand the Products, across a multitude of media platforms,
26    including the product labels, packaging, and online advertisements, over a long
27    period of time, in order to gain an unfair advantage over competitor products
28    without the deceptive claims.

64.    Plaintiff and class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

65.    A primary litigation objective in this litigation is to obtain injunctive relief. Injunctive relief is appropriate on behalf of Plaintiff and members of the class because Defendant continues to misrepresent the Products as containing "No Artificial Colors, Flavors or Preservatives" when the Products actually contain an artificial preservative ingredient.

66.    Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm).

67.    Injunctive relief, in the form of affirmative disclosures or halting the sale of unlawful sold products is necessary to dispel the public misperception about the Products that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements stating that the Products actually contain an artificial preservative ingredient. An injunction requiring affirmative disclosures to dispel the public's misperception, and prevent the ongoing deception and repeat purchases, is also not available through a legal remedy (such as monetary damages).

68.    Further, because a public injunction is available under the UCL, and damages will not adequately benefit the general public in a manner equivalent to an injunction.

69.    It is premature to determine whether an adequate remedy at law exists. No discovery has been conducted, and no expert reports have been

exchanged. Defendant's internal documents may provide insight into different damages theories such as restitution in the form of the profits gained attributable to the conduct at issue.

## CLASS ACTION ALLEGATIONS

70.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Classes:

**California Class**

All persons who purchased the Products for personal use in California within the applicable statute of limitations until the date class notice is disseminated.

**Multi-State Express Warranty Class**

All persons who purchased the Products for personal use in California and other states with similar express warranty laws within the applicable statute of limitations until the date class notice is disseminated.

**Multi-State Unjust Enrichment Class**

All persons who purchased the Products for personal use in California and other states with similar unjust enrichment common laws within the applicable statute of limitations until the date class notice is disseminated.

(collectively, these are referred to as the "Class" unless otherwise indicated)

71.    Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial officers and their immediate family members and associated court staff assigned to the case; (iv) individuals who received a full refund of the Products from Defendant.

72.    Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate

subclasses, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

73.     The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

74.     Numerosity: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

75.     Commonality: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.     Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.     Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Products;

c.     Whether Defendant made misrepresentations concerning the Products that were likely to deceive the public;

d.     Whether Plaintiff and the Class are entitled to injunctive relief;

e.     Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

76.     Typicality: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading

1    conduct and purchased the Products. Plaintiff is entitled to relief under the same

2    causes of action as the other Class Members.

3        77.    Adequacy: Plaintiff is an adequate Class representative because

4    Plaintiff's interests do not conflict with the interests of the Class Members

5    Plaintiff seeks to represent; the consumer fraud claims are common to all other

6    members of the Class, and Plaintiff has a strong interest in vindicating the rights

7    of the class; Plaintiff has retained counsel competent and experienced in complex

8    class action litigation and Plaintiff intends to vigorously prosecute this action.

9    Plaintiff has no interests which conflict with those of the Class. The Class

10   Members' interests will be fairly and adequately protected by Plaintiff and

11   proposed Class Counsel. Defendant has acted in a manner generally applicable to

12   the Class, making relief appropriate with respect to Plaintiff and the Class

13   Members. The prosecution of separate actions by individual Class Members

14   would create a risk of inconsistent and varying adjudications.

15       78.    The Class is properly brought and should be maintained as a class

16   action because a class action is superior to traditional litigation of this

17   controversy. A class action is superior to the other available methods for the fair

18   and efficient adjudication of this controversy because:

19       a.    The joinder of hundreds of individual Class Members is

20   impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or

21   litigation resources;

22       b.    The individual claims of the Class Members may be relatively modest

23   compared with the expense of litigating the claim, thereby making it impracticable,

24   unduly burdensome, and expensive to justify individual actions;

25       c.    When Defendant's liability has been adjudicated, all Class Members'

26   claims can be determined by the Court and administered efficiently in a manner

27   far less burdensome and expensive than if it were attempted through filing,

28   discovery, and trial of all individual cases;

CLASS ACTION COMPLAINT

d.    This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among Class Members;

g.    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.    Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

79.    Additionally or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

80.    Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and the Class members.

81.    Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

1

**FIRST CLAIM FOR RELIEF**

2

**Violation of California's Consumers Legal Remedies Act**

3

**Cal. Civ. Code §§ 1750, *et seq.***

4     82.    Plaintiff realleges and incorporates by reference all allegations

5     contained in this complaint, as though fully set forth herein.

6     83.    Plaintiff brings this claim under the CLRA individually and on

7     behalf of the California Class against Defendant.

8     84.    At all times relevant hereto, Plaintiff and the members of the Class

9     were "consumer[s]," as defined in California Civil Code section 1761(d).

10     85.    At all relevant times, Defendant was a "person," as defined in

11     California Civil Code section 1761(c).

12     86.    At all relevant times, the Products manufactured, marketed,

13     advertised, and sold by Defendant constituted "goods," as defined in California

14     Civil Code section 1761(a).

15     87.    The purchases of the Products by Plaintiff and the members of the

16     Class were and are "transactions" within the meaning of California Civil Code

17     section 1761(e).

18     88.    Defendant disseminated, or caused to be disseminated, through its

19     advertising, false and misleading representations, including the Products' labeling

20     that the Products contain "No Artificial Colors, Flavors or Preservatives."

21     Defendant failed to disclose that the Products contain an artificial preservative

22     ingredient called citric acid. This is a material misrepresentation and omission as

23     reasonable consumer would find the fact that the Products contain an artificial

24     preservative ingredient to be important to their decision in purchasing the

25     Products. Defendant's representations violate the CLRA in the following ways:

26     a)    Defendant represented that the Products have characteristics,

27     ingredients, uses, and benefits which they do not have (Cal. Civ. Code §

28     1770(a)(5));

b)    Defendant represented that the Products are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

c)    Defendant advertised the Products with an intent not to sell the Products as advertised (Cal. Civ. Code § 1770(a)(9)); and

d)    Defendant represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

89.    Defendant violated the CLRA because the Products were prominently advertised as containing "No Artificial Colors, Flavors or Preservatives," but, in reality, the Products contain an artificial preservative called citric acid. Defendant knew or should have known that consumers would want to know that the Products contain an artificial preservative.

90.    Defendant's actions as described herein were done with conscious disregard of Plaintiff's and the Class members' rights and were wanton and malicious.

91.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the Products have characteristics which they do not have.

92.    Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein. Plaintiff also seeks actual damages, punitive damages, and attorneys' fees and costs for Defendant's violations of the CLRA.

93.    Pursuant to California Civil Code section 1782, Plaintiff will send a written demand letter requesting that Defendant remedy the violations alleged herein. If more than thirty days pass after Defendant received Plaintiff's demand letter and Defendant fails to take any corrective action, Plaintiff will amend the

1    complaint to seek actual and punitive damages in addition to injunctive relief, and

2    attorneys' fees and costs for Defendant's violations of the CLRA.

3        94.    Pursuant to section 1780(d) of the CLRA, attached hereto is an

4    affidavit showing that this action was commenced in a proper forum.

5    **SECOND CLAIM FOR RELIEF**

6    **Violation of California's Unfair Competition Law**

7    **Cal. Bus. & Prof. Code §§ 17200, *et seq.***

8        95.    Plaintiff realleges and incorporates by reference all allegations

9    contained in this complaint, as though fully set forth herein.

10        96.    Plaintiff brings this claim under the UCL individually and on behalf

11    of the California Class against Defendant.

12        97.    The UCL prohibits any "unlawful," "fraudulent," or "unfair"

13    business act or practice and any false or misleading advertising.

14        98.    Defendant committed unlawful business acts or practices by making

15    the representations and omitted material facts (which constitutes advertising

16    within the meaning of California Business & Professions Code section 17200), as

17    set forth more fully herein, and by violating California's Consumers Legal

18    Remedies Act, Cal. Civ. Code §§17500, *et seq.*, California's False Advertising

19    Law, Cal. Bus. & Prof. § 17500, *et seq.*, 15 U.S.C. § 45, and by breaching express

20    and implied warranties.

21        99.    Plaintiff, individually and on behalf of the other Class members,

22    reserves the right to allege other violations of law, which constitute other unlawful

23    business acts or practices. Such conduct is ongoing and continues to this date.

24        100.    Defendant committed "unfair" business acts or practices by: (1)

25    engaging in conduct where the utility of such conduct is outweighed by the harm

26    to Plaintiff and the members of the a Class; (2) engaging in conduct that is

27    immoral, unethical, oppressive, unscrupulous, or substantially injurious to

28    Plaintiff and the members of the Class; and (3) engaging in conduct that

undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising. Plaintiff and the other Class members paid for a Product that is not as advertised by Defendant. Further, Defendant failed to disclose a material fact (that the Products contain an artificial preservative) of which it had exclusive knowledge. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and material omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

101. Defendant committed "fraudulent" business acts or practices by making the representations of material fact regarding the Products set forth herein. Defendant's business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Products actually contain no artificial preservatives.

102. Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Products and Defendant's unlawful, unfair, and fraudulent practices.

103. Defendant's wrongful business practices and violations of the UCL are ongoing.

104. Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of

1    calculation, and Plaintiff and the Class seek interest in an amount according to

2    proof.

3         105.    Unless restrained and enjoined, Defendant will continue to engage

4    in the above-described conduct. Accordingly, injunctive relief is appropriate.

5    Pursuant to California Business & Professions Code section 17203, Plaintiff,

6    individually and on behalf of the Class, seeks (1) restitution from Defendant of

7    all money obtained from Plaintiff and the other Class members as a result of unfair

8    competition; (2) an injunction prohibiting Defendant from continuing such

9    practices in the State of California that do not comply with California law; and

10   (3) all other relief this Court deems appropriate, consistent with California

11   Business & Professions Code section 17203.

12   **THIRD CLAIM FOR RELIEF**

13   **Breach of Express Warranty**

14   **Cal. Com. Code § 2313(1)**

15        106.    Plaintiff realleges and incorporates by reference all allegations

16   contained in this complaint, as though fully set forth herein.

17        107.    Plaintiff brings this claim for breach of express warranty individually

18   and on behalf of the Multi-State Express Warranty Class against Defendant.

19        108.    As the manufacturer, marketer, distributor, and seller of the

20   Products, Defendant issued an express warranty by representing to consumers at

21   the point of purchase that the Products contain "No Artificial Colors, Flavors or

22   Preservatives."

23        109.    Plaintiff and the Class reasonably relied on Defendant's

24   misrepresentations, descriptions and specifications regarding the Products,

25   including the representation that the Products contain "No Artificial Colors,

26   Flavors or Preservatives."

27

28

CLASS ACTION COMPLAINT

110.   Defendant's representations were part of the description of the goods and the bargain upon which the goods were offered for sale and purchased by Plaintiff and Members of the Class.

111.   In fact, the Products do not conform to Defendant's representations because the Products contain an artificial preservative called citric acid. By falsely representing the Products in this way, Defendant breached express warranties.

112.   Plaintiff relied on Defendant's (the manufacturer) representations on the Products' labels and advertising materials which provide the basis for an express warranty under California law.

113.   As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Class were injured because they: (1) paid money for the Products that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Products they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant's representations about the characteristics of the Products were truthful. Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiff and Class Members would not have purchased the Products or would not have paid as much as they did for them.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

114.   Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

115.   Plaintiff brings this claim for individually and on behalf of the Multi-State Unjust Enrichment Class against Defendant.

116.   To the detriment of Plaintiff and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

117.    Plaintiff and the Class conferred a benefit on Defendant when they paid Defendant money for the Products which they did not know were falsely advertised.

118.    Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

119.    Plaintiff has privity with Defendant as Plaintiff and other class members purchased the Product directly from Defendant.

120.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

121.    Thus, Plaintiff and the Class seek disgorgement of all wrongfully obtained for the money received by Defendant as a result of Defendant's inequitable conduct as stated herein.

## <u>REQUEST FOR RELIEF</u>

Plaintiff, individually, and on behalf of all others similarly situated, request for relief pursuant to each claim set forth in this complaint, as follows:

122.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel;

123.    Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

124.    Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

125.    Ordering damages in amount which is different than that calculated for restitution for Plaintiff and the Class;

1    126.    Ordering Defendant to pay attorneys' fees and litigation costs to
2    Plaintiff and the other members of the Class;

3    127.    Ordering Defendant to pay both pre- and post-judgment interest on
4    any amounts awarded; and

5    128.    Ordering such other and further relief as may be just and proper.

6                                      <u>**JURY DEMAND**</u>

7    129.    Plaintiff demands a trial by jury of all triable claims.

8    Dated: July 8, 2025                          CROSNER LEGAL, P.C.

9

10                                          By:      */s/ Craig W. Straub*
                                                        Craig W. Straub
11

12                                          9440 Santa Monica Blvd. Suite 301
                                            Beverly Hills, CA 90210
13                                          Tel: (866) 276-7637
14                                          Fax: (310) 510-6429
                                            craig@crosnerlegal.com
15
16                                          Attorneys for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

1

## Affidavit Pursuant to Civil Code Section 1780(d)

2      I, CRAIG W. STRAUB, declare as follows:

3      1.    I am an attorney duly licensed to practice before all of the courts of

4 the State of California. I am one of the counsel of record for Plaintiff.

5      2.    This declaration is made pursuant to § 1780(d) of the California

6 Consumers Legal Remedies Act.

7      3.    Defendant has done, and is doing, business in California, including

8 in this judicial district. Such business includes the marketing, promotion,

9 distribution, and sale of the Products within the State of California.

10     I declare under penalty of perjury under the laws of the State of California

11 that the foregoing is true and correct. Executed July 8, 2025 at San Diego,

12 California.

13                                    CROSNER LEGAL, P.C.

14

15                                    By:       /s/ Craig W. Straub

16                                              Craig W. Straub

17                                    9440 Santa Monica Blvd. Suite 301
                                      Beverly Hills, CA 90210
18                                    Tel: (866) 276-7637
19                                    Fax: (310) 510-6429
                                      craig@crosnerlegal.com
20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT